UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


SVITLANA VASILVNA TOMYNETS,

       Petitioner,

v.                                   Case No. 8:16-cv-3025-T-27AAS

MOSES IVANOVICH KOULIK,

       Respondent.

_____/

## <u>REPORT AND RECOMMENDATION</u>

This matter is before the undersigned on referral by the Honorable James D. Whittemore, United States District Judge, for an evidentiary hearing on Petitioner's Verified Petition for the Return of Minor Child Pursuant to Hague Convention (the "Petition"). (Doc. 4). Respondent, Moses Ivanovich Koulik ("Respondent"), has not filed an answer to the Petition.

Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), which is embodied in the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011 (formerly cited as 42 U.S.C. §§ 11601-11610), Petitioner, Svitlana Vasilvna Tomynets ("Petitioner"), seeks an order directing a prompt return of her minor child, S.O.T.,[1] to Ukraine, and also seeks an award of the fees and costs incurred in connection with the Petition, including transportation costs, under 42 U.S.C. § 11607.

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a), a minor's initials are used in lieu of the full name.

The undersigned held a multi-day evidentiary hearing on the matter over the following days: January 20, 2017; February 21, 2017; February 22, 2017; February 24, 2017; March 3, 2017; and March 6, 2017. Both Petitioner and Respondent were represented by counsel and testified. Additionally, the parties called other witnesses to testify.[2] Also, at the request of the parties, the undersigned interviewed S.O.T. in camera on March 7, 2017.[3]

On March 10, 2017, the undersigned ordered that Dr. Debra Carter, a child psychologist with significant experience in cases brought pursuant to the Hague Convention, examine S.O.T. and prepare a report of her findings and conclusions. (Doc. 51). On April 27, 2017, Dr. Carter submitted her psychological evaluation to the undersigned. (Doc. S-54). The next day, the undersigned distributed Dr. Carter's psychological evaluation to counsel of record via email and, given the nature of the information included, directed the Clerk of Court to place it under seal. (Doc. 53).

After careful consideration of this thorough record, the undersigned recommends that the Petition (Doc. 1) be granted and the Court direct that S.O.T. be promptly returned to Ukraine.

---

[2] During the course of the evidentiary hearing, Petitioner called the following witnesses to testify: Alexander Lochow (interpreter for Petitioner throughout the proceedings and also a witness to numerous visitations between Petitioner and S.O.T.); Volodemir Petukhov (former director of a non-profit organization hired by Ukraine's Ministry of Internal Affairs to assist some of the alleged victims of Respondent); Victoria Tomynets (Petitioner's sister); and Vasili Tomynets (Petitioner's father).

Respondent called the following witnesses to testify: Vladimir Borissov (notary who notarized Joint Exs. 1 and 5); Marey Malosh (a follower of Respondent); Olena Petrenko (a follower of Respondent); Ella Kulik (Respondent's daughter); Martin de Porres (a follower of Respondent); Olga Kukotka (a follower of Respondent); and Jan Broucinek (a friend of Respondent).

[3] On January 30, 2017, after the parties requested that the undersigned interview S.O.T., the undersigned appointed a Guardian Ad Litem for S.O.T. in this case. (Doc. 35).

## I.    SUMMARY OF DISPUTE[4]

Petitioner, S.O.T.'s mother, alleges that S.O.T., who is under 16 years of age,[5] was removed by Respondent (S.O.T.'s father) from her habitual residence (Ukraine) to the United States and then wrongfully retained in breach of Petitioner's custody rights, which Petitioner was exercising.  To the contrary, Respondent contends that S.O.T.'s habitual residence was not Ukraine and that Petitioner's demand for the return of S.O.T. is untimely, as S.O.T. has now been residing in Florida for over four years and is settled.  Respondent further contends that: Petitioner consented to S.O.T. remaining in the United States; Petitioner was not exercising her custody rights at the time of the alleged wrongful retention; there is a grave risk that the return of S.O.T. to Ukraine would expose S.O.T. to physical or psychological harm or otherwise place her in an intolerable situation; and S.O.T. objects to being returned to Ukraine and is of sufficient age and maturity to make that decision.

## II.    FACTUAL FINDINGS NECESSARY FOR DETERMINATION OF HAGUE CONVENTION PETITION

### A.    <u>Testimony at the Evidentiary Hearing</u>[6]

Petitioner is a citizen of Ukraine and has resided there her entire life.  Petitioner is

---

[4] This brief summary of Petitioner's allegations and Respondent's defenses is drawn from the Petition as well as the argument and testimony presented during the evidentiary hearing.  Because Respondent never formally responded in writing to the Petition, the undersigned has gone to great lengths to infer broadly his defenses to the repatriation of S.O.T.

[5] The parties do not dispute S.O.T.'s age.

[6] Both Petitioner and Respondent presented a plethora of testimony and documentary evidence that is relevant to the underlying custody dispute.  However, much of that information is not relevant to the more limited issue before this Court pursuant to the Hague Convention.  Consequently, the undersigned has only included the factual findings necessary for the Court to decide the issues that are pending before this Court.

employed as a bookkeeper assistant at a company named Prime Print, located in Kiev, Ukraine. She also sells scarves, sweaters, and tableware that she has knitted. Petitioner's parents live in Ukraine. Petitioner also has two siblings in Ukraine. Petitioner's sister, Victoria, has a daughter, and Petitioner's brother, Alexander, has two children. Petitioner also has a close family friend, who she referenced as a "second brother," with two daughters, for a total of five children, other than S.O.T., in Petitioner's extended family.

Respondent[7] was born in Ukraine, but became a naturalized citizen of the United States in 2001. Respondent has a wife, whom he married in July 2016. Respondent's wife is currently pregnant with their first child together. Respondent also has, from a prior marriage, an adult daughter who lives in Michigan.[8] Respondent's father and brother live in Ukraine.

Petitioner met Respondent in 1999 when she attended a church that Respondent opened and for which he served as a priest in Uzhgorod, Ukraine, Petitioner's hometown. According to Petitioner, she and Respondent began living together as a couple in 2003. However, Respondent testified that he and Petitioner were not a couple until 2007. In any event, on March 28, 2008, S.O.T. was born in Ukraine to Petitioner and Respondent, her biological parents.[9]

---

[7] In addition to his birth name, Oleg Ivanovich Koulik, Respondent also has used the aliases Oleh Ivanovich Kolik and Oleg Ivanovich Kulik. Respondent legally changed his first name to "Moses" when he was ordained as a bishop by his church.

[8] That daughter, Ella Kulik, testified that she travelled to see S.O.T. once about four years ago, and that she talks to S.O.T. on the telephone or via Skype a couple of times per month.

[9] S.O.T.'s original birth certificate, however, did not list Respondent as S.O.T.'s father, but rather listed the fictitious name "Tomynets Oleg Ivanovich," which is Petitioner's last name and Respondent's birth first and middle name. (Joint Ex. 2). According to Petitioner, this fictitious name was listed because Respondent did not want to be listed on S.O.T.'s birth certificate. When Petitioner and Respondent married, Respondent changed S.O.T.'s birth certificate so that Respondent is now correctly listed as her father. Respondent later explained

4

From the day S.O.T. was born until December 3, 2012, she lived in Kiev, Ukraine, in an apartment that Petitioner and Respondent purchased in 2005. The address of that apartment is Prospect Nauka, 54B.[10] During that time, S.O.T. was involved in extracurricular activities with other children and appeared to have a healthy and loving relationship with her mother and family in Ukraine. (Pet. Exs. 12, 13).

For the first few months after S.O.T.'s birth, Respondent lived with S.O.T. and Petitioner. However, according to Petitioner, after a few months, Respondent could not stand how much S.O.T. cried and left to live elsewhere. Respondent would visit Petitioner and S.O.T., but not every day, and would stay for about fifteen minutes. On October 9, 2009, Petitioner and Respondent were married in Ukraine. Less than a week later, Respondent left Ukraine to the United States.

According to Respondent, he moved to the United States in October 2009 because he feared for his safety after an incident occurred at his apartment that allegedly involved the Komitet Gosundarstvennoy Bezopasnosti (more commonly known as "KGB").[11] Respondent alleges that people broke into the apartment and stole his computer and documents. Also,

_____

to Petitioner that he changed the birth certificate so it would be easier for S.O.T. to travel to the United States.

[10] This is the apartment that Petitioner was living in when she left temporarily in January 2017, to travel to Tampa, Florida, for these proceedings. During the course of the proceedings, while Petitioner was in the United States, Respondent mailed a "power of attorney" document (Pet. Ex. 17) to one of his followers, Respondent's witness Olena Petrenko, who Respondent referred to as a "good parishioner" and "faithful woman." In January 2017, Respondent asked Ms. Petrenko to go into Petitioner's apartment, change the locks, and take possession of the apartment.

[11] According to Respondent, he is being persecuted by the KGB because he was a good priest that liked to do good acts and did not listen to the KGB.

according to Respondent, Petitioner fell down and lost consciousness during this home invasion. Petitioner claims that she was not attacked and did not lose consciousness at any time. Petitioner testified that the people who purportedly "broke in" the apartment were church members—the husbands and fathers of the female church members with whom Respondent allegedly had sexual relations.

Within a month after Respondent left Ukraine for the United States, Petitioner testified that the Kiev police came to her apartment, with a search warrant, looking for Respondent. Petitioner called Respondent via Skype to tell him that the police were there. Respondent testified that they were "fake police" and that the criminal investigation is a KGB-led political and religious persecution. Petitioner testified that Respondent's position that he is being persecuted by the KGB is a "fairy tale" made up by Respondent.[12]

Petitioner later learned from Respondent, as well as the victims, that he had sexual relations with female members of the church where he served as priest. Respondent told Petitioner that his plan involved impregnating more women to multiply God's children, as he viewed himself as the Messiah. Respondent told Petitioner that he was the reincarnation of Jesus Christ and convinced others in the church to believe this. Eventually, criminal charges were brought against Respondent because female church members claimed that he had sexual relations with them after hypnotizing them while performing prayers. Consequently, Respondent, at least as of July 5, 2015, was listed as wanted by Ukraine's Ministry of Internal Affairs. (Pet. Exs. 4 & 5). Throughout the evidentiary hearing, Respondent and his followers were adamant that the criminal investigation is a false investigation that was started by the

---

[12] In the beginning of their relationship, Petitioner believed Respondent about the persecution. Respondent encouraged his supporters to have demonstrations on his behalf and Petitioner participated in those demonstrations. (Resp. Ex. 16).

KGB. However, Respondent also testified that he, indeed, had sexual relations with multiple members of his congregation, but that those female church members, some of whom were married, wanted him to "donate [his] seeds" to them through sexual relations, so that they could try to have God's children. Respondent indicated through his testimony that he is capable of creating God's children.

Petitioner's witness Volodemir Petukhov, former director of a non-profit organization in Kiev, testified about his experience working with Respondent's victims and the families of those victims. Ukraine's Ministry of Internal Affairs hired Mr. Petukhov's organization to consult with the criminal investigation of Respondent. The role of Mr. Petukhov's organization was to assist the victims with psychological rehabilitation as well as with judicial consultations. He testified that, in 2008, people from Respondent's church reported that Respondent was performing sexual acts on church members while they were in a psychological trance and then taking their belongings. Seventeen individuals, the youngest of whom was 17 years old, reported to Mr. Petukhov's organization that they had been sexually abused by Respondent. Mr. Petukhov testified that, in his professional opinion as a psychologist, Respondent is a manipulative person.

Respondent's witness, Maria Malosh, a follower of Respondent, was questioned about Respondent having sexual relations with church members. Ms. Malosh testified that it was a lie. In addition, Olena Petrenko, another follower of Respondent, testified that she had not heard that Respondent had sexual relations with members of his church. Neither of these followers was willing to believe that Respondent had already admitted in his testimony that he had indeed had sexual relations with his church members.

After Respondent left for the United States, Petitioner and S.O.T. made two trips to visit him: one from April to September 2011 (the "2011 trip"); and the other from February to August 2012 (the "2012 Trip"). (Pet. Ex. 16). Petitioner testified that the purpose of the 2011 trip was to visit Respondent, who was in the process of securing visas for Petitioner and S.O.T. During the first trip, Petitioner had no intention to remain in the United States permanently, but did want the ability to travel to the United States freely with S.O.T. so that S.O.T. could continue to see her father.

Respondent testified that the plan at the time of the 2011 trip was for Petitioner and S.O.T. to "stay forever" in the United States. Petitioner had permanent resident paperwork at that time—issued April 12, 2011 with an expiration date of April 12, 2013. (Resp. Ex. 5). They also obtained social security cards for Petitioner and S.O.T. during this visit. (Resp. Exs. 4, 5). However, also according to Respondent, Petitioner did not like the United States and they were not getting along.

During the 2011 trip, Respondent took Petitioner to a notary in Pinellas County, Florida, to execute documents permitting Respondent to travel with S.O.T. One document, which was executed by Petitioner and notarized on August 18, 2011, memorialized that Petitioner was giving Respondent permission "to travel in the world, 2011-2020, visit Ukraine and come with my doter [sic] back in USA." (Joint Ex. 1). The second document, which was executed by Petitioner and notarized on September 7, 2011, memorialized that Petitioner was giving Respondent permission "to travel in the world, 2011-2013, visit Ukraine and come with my doter [sic] back in USA." (Joint Ex. 5).[13] Petitioner did not intend for either document to

---

[13] Consistent with Petitioner's testimony, the notary, Vladimir Borissov, testified that Respondent represented that the purpose of this document was for Respondent to be able to travel with S.O.T. Respondent testified that similar documents were also made for the purpose

indicate that she agreed that Respondent could keep S.O.T. in the United States for the referenced time periods.

At the beginning of the 2012 trip, Petitioner intended to try to remain in the United States, but, during that trip, she changed her mind because the home that Respondent had purchased was uninhabitable. Respondent testified that Petitioner became very critical of him during the 2012 trip, even though at the beginning of the trip she was acting like a "very good wife." Respondent testified that, after a few weeks, he was no longer interested in her as a woman. By the end of the 2012 trip, Respondent was praying to God that Petitioner would return to Ukraine. During the 2012 trip, Petitioner exacerbated an existing back injury while helping Respondent dig a ditch for purposes of laying a sewer line because the house did not have running water. Petitioner sought medical treatment for her back when she returned to Ukraine. (Pet. Ex. 3).

After Petitioner and S.O.T. returned to Ukraine in September 2012, Respondent and S.O.T. stayed in touch via Skype. In October 2012, Petitioner had S.O.T. examined by a pediatrician to determine whether S.O.T. was healthy and could be admitted into preschool in Ukraine.[14] (Pet. Ex. 6).

---

of enabling Petitioner to travel with S.O.T. According to Respondent, the versions for Petitioner were identical to the documents in Joint Exhibits 1 and 5, but Petitioner's name was substituted for Respondent's name. Also, according to Respondent, the purpose of the version for each parent with the two year timeframe instead of the nine year timeframe was in case any country thought the nine year timeframe was too long.

[14] According to Petitioner, health care at the government clinics in Ukraine are free. Citizens of Ukraine are not required to purchase health insurance, but Petitioner nevertheless purchased health insurance for S.O.T. Petitioner also paid to have S.O.T.'s cord blood stem cells preserved when S.O.T. was born. (Pet. Ex. 1). Petitioner has been making payments annually to continue to preserve the cord blood stem cells. (*Id.*).

Respondent proposed that S.O.T. come to the United States on a temporary basis while Petitioner was receiving medical treatment for her back. Originally, Respondent proposed a three month visit, but Respondent, without first informing Petitioner, ultimately purchased non-refundable tickets for a six month visit, from December 3, 2012, until June 3, 2013. (Joint Ex. 3). Respondent convinced Petitioner that the six month visit would be okay by telling her that the tickets were nonrefundable, that the visit would be short term while Petitioner was receiving medical treatment for her back, and that S.O.T. would be able to complete her immunizations in the United States. Petitioner testified that she never would have let S.O.T. travel to the United States in December 2012 if she had known that Respondent would not be returning S.O.T. to Petitioner six months later.[15]

Starting in early December 2012, Petitioner spoke to S.O.T. every day—mostly via Skype, but also by telephone and letter. Those communications remained consistent until June 2013, when Respondent did not return S.O.T. to Petitioner. At that point, Respondent began to block Skype calls, and Petitioner's ability to communicate with S.O.T. became more difficult. Because Petitioner was unable to communicate with S.O.T. via Skype, Petitioner mailed letters and drawings to S.O.T. in an effort to preserve their connection and bond. (Pet. Ex. 14). Petitioner testified that she mailed letters and drawings starting in 2013 and never stopped.[16] She also mailed packages with gifts for S.O.T.; Petitioner started doing that for S.O.T.'s birthday in March 2013 and never stopped. The last package Petitioner sent to S.O.T. was in

---

[15] On April 25, 2013, Petitioner registered S.O.T. for a preschool in Ukraine so that she would be able to attend school upon her return in June 2013. (Pet. Ex. 9).

[16] Petitioner testified that she used an online translator so that she could write messages to S.O.T. in English.

December 2016 for Christmas—approximately one month before Petitioner arrived in the United States for these proceedings. Petitioner testified that none of those packages were ever returned to her in Ukraine as undeliverable.

On June 3, 2013, the date that Respondent was supposed to depart the United States with S.O.T. to return her to Petitioner, Respondent instead texted Petitioner to tell her that S.O.T. was in the hospital with a high fever and was very sick. The next day, Respondent contacted Petitioner via Skype and told her that S.O.T. (five years old) did not feel well because she was afraid to return to Ukraine. When testifying about this incident, Respondent stated that S.O.T. began to panic when they were at the airport for their flight back to Moldova.[17] Respondent testified that when he left the airport he was going to take S.O.T. to the hospital, but she fell asleep in the car so he took her home instead. Since June 2013, Petitioner repeatedly asked Respondent to return S.O.T. Respondent repeatedly told Petitioner to wait and be patient and that he would return S.O.T.

Respondent claims that since June 2013, he repeatedly asked Petitioner to return to the United States so that her green card would not expire. Then, also in 2013, Respondent started submitting documents to get a new green card for Petitioner. (Resp. Ex. 6). He continued trying to obtain a green card for Petitioner until 2016. Respondent testified that, ultimately, he was unable to locate someone who would provide a "support certificate" for Petitioner's green card application and that it would be up to Petitioner to find someone.

In 2015, Respondent sent Petitioner a travel itinerary for S.O.T. to make a return trip to Ukraine. (Pet. Ex. 18). Respondent testified that S.O.T. did not want to go to Ukraine, so he

---

[17] Respondent was unwilling to travel to Ukraine because he feared being arrested upon return. Instead, Respondent booked his travel to Moldova.

did not purchase the ticket. At the end of 2015, Petitioner sent S.O.T. a cellular telephone so that she could more easily communicate with S.O.T. They communicated via that cellular telephone for a while, but S.O.T. eventually stopped answering it.

On July 21, 2015, as part of the process for seeking help with the return of S.O.T.,[18] Petitioner had her home inspected by the Department of Children's Rights in Kiev for purposes of determining whether her home was suitable for S.O.T. to return there. (Pet. Ex. 8). S.O.T. has her own bedroom in that apartment (the largest bedroom) and Petitioner has updated the bedroom so that it is decorated in a fashion more appropriate for S.O.T.'s current age (nine years old), rather than the age she was when she left for the United States in December 2012 (four years old).

On October 17, 2015, via a series of Skype messages, Respondent told Petitioner that S.O.T. was "almost half dead" due to her allergies. (Pet. Ex. 2, p. 2). Respondent told Petitioner that he had no money to buy S.O.T. the medication that she needed. At the evidentiary hearing, Respondent admitted that the message was a lie because S.O.T. had already been given medication and was not in critical condition.

Then, on October 21, 2015, again via a series of Skype messages, Respondent wrote to Petitioner:

> It's horrible. It happened what I warned you, but you continued its stubborn greed on my money. The State took [S.O.T.] from us to the child welfare. They took her straight from school and when I came to school, they said its [sic] because we don't have money for her alimony. The letter was sent to you, but you ignored it and didn't answer, and the state took this into account. They don't forgive such things. They do not even say the address, for me not to do stupid things. They said that it would be better for child, because I do not have any profit. I'm searching for a work for two months and all the time they only promised, but they sent a letter that they do not have vacations. And today I

---

[18] On August 22, 2015, Petitioner submitted her application to the Ministry of Justice in Ukraine for assistance with the return of S.O.T. (Doc. 1, Ex. N).

found out that my caregiver certificate is not suitable and I should learn [sic] at least a month for $1,500 for this certification. And also debts for communal services were not paid. It is all was a good argument for government to take [S.O.T.].

(*Id.*, p. 3). Respondent also testified that this entire Skype message was a lie. He further testified that another Skype message he sent telling Petitioner that she had to send $5,000 U.S. dollars so that a judge would return S.O.T. to Respondent was also a lie. (*Id.*).

Although Petitioner had submitted her application for assistance with the return of S.O.T. pursuant to the Hague Convention in August 2015 (Doc. 1, Ex. N), Petitioner testified that it was not until September 2016 that she fully realized that Respondent was never going to return S.O.T. voluntarily. Until then, even though her application for assistance was pending, Petitioner had been trying to work with Respondent to reach a mutual agreement and convince him to voluntarily return S.O.T. Petitioner had no visa or other way to enter the United States.

In 2016, Respondent began divorce proceedings in the Sixth Judicial Circuit in Pinellas County, Florida. Respondent sent the paperwork to Petitioner, but sent it to her old address in her hometown of Uzhgorod instead of sending the paperwork to their apartment in Kiev, where Respondent knew Petitioner had been living for the last thirteen years. The divorce was finalized by default in June 2016. Respondent then married his current wife one month later. Respondent's current wife is also Ukrainian.

Since at least 2009, Respondent has been unemployed. Throughout the time that Respondent has had S.O.T. in the United States, Petitioner has sent Respondent money. Petitioner testified that she sent money in 2014, 2015, and maybe 2016. Petitioner testified that Respondent blackmailed her to send money by telling her that S.O.T. needed things and that the house was falling apart. Petitioner testified that when she encouraged Respondent to get a job, he responded that he had worked enough and that he was not born to work. Respondent

attributed his current unemployment to being disabled. More specifically, he testified that he has severe pain in his cervical spine due to two car accidents[19] that exacerbated an already bad back and that he has been disabled since 2014 or 2015.[20] Respondent's last paying job was preaching weekly to his parishioners via Skype in 2013. Respondent testified that he still preaches, but does it without pay. He testified that he does not have time to work because he is busy taking care of S.O.T. "24 hours seven days." In addition to $735 that Respondent receives monthly for his disability, Respondent receives public assistance for S.O.T.

Presently, S.O.T. attends elementary school and is in the third grade. She also goes to an after school program hosted by the YMCA. She eats breakfast and lunch at her school, and she eats dinner at the after school program. She is often absent from school and is frequently tardy. (Res. Ex. 7). In the first grade, S.O.T. was absent 7 days and tardy 37 days. (*Id.*). In the second grade, S.O.T. was absent 11 days and tardy 29 days. (*Id.*). In the first reporting period, which is approximately three months, of the third grade (her current grade), S.O.T. was absent 1 day and tardy 6 days. (*Id.*).[21] The school records indicate that, according to her teachers, the excessive absences and tardies are affecting S.O.T.'s schoolwork. (*Id.*).

---

[19] Respondent testified that one car accident occurred in 2010 and the other occurred in 2013. He used part of the money that he received as a result of one of those accidents to purchase an RV.

[20] Throughout the multi-day evidentiary hearing, Respondent brought a cane to the courtroom. When asked about his use of the cane, Respondent testified that he does not use the cane every day. He goes to the YMCA every day to work out and play tennis there and does not use his cane during these activities. Additionally, Respondent testified that he does yard work at their house.

[21] These are the most current school records in evidence.

S.O.T. speaks Ukrainian, and Petitioner and S.O.T. orally communicate in Ukrainian. S.O.T. cannot write in Ukrainian. Petitioner testified that S.O.T. is not a happy child and is not social or personable. According to Petitioner, S.O.T.'s personality began to change after she was not returned to Ukraine.

Throughout these proceedings, there was testimony about odd behavior by S.O.T. For example, one witness, Alexander Lochow, testified that S.O.T. drank hydrogen peroxide while she was at his home in February 2017. Mr. Lochow's daughter, who is only slightly older than S.O.T., was alarmed by S.O.T.'s behavior and wanted Mr. Lochow to stop S.O.T. According to S.O.T., drinking hydrogen peroxide is good for her health and her father drinks hydrogen peroxide too.

Petitioner testified that Respondent told S.O.T. that there are bad people in Ukraine that will try to cut her and take her organs. Petitioner also heard Respondent tell S.O.T. that people get killed in Ukraine and that there is a war there. Respondent tells S.O.T. that Petitioner is ugly and bad and that a child does not need a mother like Petitioner, because Petitioner cannot speak English and does not know how to drive a car.

Respondent's witness, Martin de Porres, lives in Pinellas County and sees S.O.T. at church approximately every two weeks.[22] His impression is that S.O.T. has seemed angry since Petitioner arrived in the United States. He is not familiar with whether S.O.T. has friends, and he has not seen her with friends. He described S.O.T. as a very special child, who is beyond

---

[22] Mr. de Porres testified that he serves as an archbishop and chancellor at the Ukrainian Orthodox Church, where Respondent serves as patriarch living in exile. Mr. de Porres's position in the church is inferior to Respondent's position. "Martin de Porres" is a name he chose when he became a bishop.

her years in many ways, so it is hard for her to make friends. He stated that other children at school pick on S.O.T. because of her English.

Respondent's witness, Jan Broucinek, also a member of Respondent's current church, testified that S.O.T. participates in the Sunday school class that he and his wife teach. Mr. Broucinek has observed that S.O.T. is agitated when communicating with her mom. S.O.T. has stayed at his home twice for extended visits as well as several dozen weekend visits.

**B.    <u>Interview of S.O.T. by the Undersigned</u>**

S.O.T. arrived to the interview on time and was wearing her school uniform. When the undersigned asked S.O.T. about her friends at school, S.O.T. initially said that she could not remember any of her friends' names, but was eventually able to name five children in her class. S.O.T. stated that she likes to swim and play tennis at the YMCA. S.O.T. spoke about taking gymnastics classes at the YMCA and going to Busch Gardens with Respondent. She also participates in a news club and a mathematics club at school.

S.O.T. stated that she wants to stay in the United States because she does not like Petitioner. When the undersigned inquired about the reasons she does not like her mother, S.O.T. stated that her mother yells at her, uses bad words, and hits her. Also, according to S.O.T., Petitioner is always texting her, and it is annoying because S.O.T. is busy doing other things.

When asked about Ukraine, S.O.T. stated that it is really cold in the winter and that Russian people like fighting with Ukraine people and like to kill them. S.O.T. believes her mother is lying to her when she tells her that people do not get killed in Ukraine. S.O.T. stated that she sees on television that Putin has an army and is killing people in Ukraine.

Every time the undersigned asked S.O.T. about her interactions with her father, S.O.T. said she did not understand the question. As to why she wants to stay with her father, S.O.T. relayed that he is nice to her and buys her things. S.O.T. believes that, if she goes with Petitioner, Petitioner will take S.O.T. to a doctor who will give her shots and make her "kookoo," so that she cannot move or talk.

C.      **Psychological Evaluation and Report**

At the request of the undersigned, Dr. Carter performed an extensive psychological evaluation and submitted a sixteen page report, which is her expert opinion as to some of the pending issues in this case. (Doc. 54). More specifically, the purpose of this evaluation was to get Dr. Carter's expert opinion as to the following questions:

1)      Has the Child attained a sufficient age and maturity such that the Court should consider her view in deciding this case? If so, has the Child's view been the product of undue influence?

2)      Will returning the Child to Ukraine expose her to a grave risk of psychological or physical harm or otherwise place the Child in an intolerable situation?

Dr. Carter reviewed the following records in connection with her evaluation:

- Order Staying Proceeding;
- Order (Appointing Evaluator);
- S.O.T.'s Medical Records;
- S.O.T.'s School Records;
- Petitioner's Medical Records;
- Clearwater Police Department Incident Report (2.13.17);
- Translation of electronic mail correspondence between parties;
- Screenshots of text messages between parties and child;
- Photos of parents with child in Ukraine and the United States;
- Copies of written correspondence (cards, letters) between Mother and child;
- Copies of news articles re: alleged persecution of Respondent in Ukraine; and
- Photos of adults with wounds (alleged persecution in Ukraine).

Dr. Carter also interviewed S.O.T., Petitioner, Respondent, and the following collateral sources: Ms. Moses (S.O.T.'s third grade teacher); Mrs. Tabitha Griffin (Principal at S.O.T.'s school), and Mr. Lochow (Interpreter for Petitioner). Dr. Carter observed the interactions between each parent with S.O.T. and performed a variety of tests on Petitioner, Respondent, and S.O.T.

Upon reviewing S.O.T.'s medical records, Dr. Carter noted that S.O.T. receives medical care for allergic rhinitis due to animal hair/dander and dust mites; allergic conjunctivitis; and mild intermittent asthma. Medical records indicate that S.O.T. is underweight for her height by approximately 20 lbs., and she has significant dental decay and cavities. Of note, records also indicate that Respondent repeatedly has raised the issue of S.O.T. having parasites to medical professionals since 2013. Medical records indicate Respondent has been provided education about toxoplasmosis, including that S.O.T. could not get "parasites" from her mother and that S.O.T. had an intact immune system and showed no signs of illness. Respondent also raised this issue with Dr. Carter during his interview, stating that he believes Petitioner is infected with Demodex Hair Mites (parasites in hair follicles) and that S.O.T. is infected when she is in contact with her mother.

Dr. Carter noted that, during parent-child observations between Petitioner and S.O.T., there was no indication that S.O.T. was scared or uncomfortable in her mother's presence. While S.O.T. was attempting to reinforce her claims that she hated Petitioner and did not want to interact with her by having belligerent and defiant interactions, S.O.T. responded to requests and direction from Petitioner without significant incident. Dr. Carter reported that Respondent has claimed that S.O.T. professes her wish to remain with him and not to have parenting time with her mother. However, Dr. Carter found evidence to believe that Respondent has unduly influenced S.O.T. to adopt this attitude, e.g., implying that S.O.T. may come to some harm

while in her mother's care or risk imprisoning her father if she does not declare a preference for him.  It is Dr. Carter's belief that Respondent has engaged in a type of undue influence called "restrictive gatekeeping" based on Respondent's unverifiable belief that Petitioner has serious parenting skill deficits, a serious mental disorder, and that S.O.T. will be kidnapped, persecuted, or killed if she returns to Ukraine.  Dr. Carter opined that S.O.T. presents as a child who has been the victim of pathological alienation.  S.O.T. views her mother as all bad and her view of her father is idealized.  Dr. Carter noted that S.O.T. also shows behavioral signs of distress (Tic Disorder, Anxiety) and clearly feels immense pressure to protect her father.

It is Dr. Carter's opinion that S.O.T. is established in school in the United States, because she attended elementary school in this country for the past three years.  S.O.T. is acclimated to the American academic curriculum and expectations and she has never attended formal education in Ukraine.  She speaks only English while at school and is becoming increasingly fluent in reading, writing, and speaking.  Dr. Carter opined that it will be a difficult adjustment for S.O.T. to acclimate to an academic setting in Ukraine with a very different style of instruction in another language.   However, to help remedy this concern, Dr. Carter noted that Petitioner has identified two schools that are designed primarily for students who are expatriates.  These schools provide instruction in English with a curriculum similar to that in American institutions.  Petitioner provided documentation to verify her interaction and application with each of these schools.  S.O.T. has been preliminarily accepted, pending entrance testing and placement.  Petitioner has also negotiated a tuition schedule that she claims she can afford.

Although Respondent has asserted his beliefs that Russian (particularly President Putin-backed) influences render Ukraine a place rife with persecution, child slavery, and secret police

killings, Dr. Carter stated that she was provided with no credible evidence to support his claims that S.O.T. will be physically harmed if she were to return to Ukraine. Dr. Carter stated that, although she is no expert on Ukrainian or Soviet-based countries and their politics, there is no reason to believe that S.O.T. will be placed in an intolerable situation should she be returned to her country of birth.

In sum, it is the opinion of Dr. Carter that S.O.T. is not of sufficient age and maturity that her view should be considered in deciding this case. In addition, it is Dr. Carter's view that Respondent has unduly influenced S.O.T. to adopt his belief that Petitioner is a bad mother, despite lack of credible evidence to support this belief. Dr. Carter could find no verifiable evidence that S.O.T. will be exposed to a grave risk of psychological or physical harm, or placed in an intolerable situation, should she be returned to Ukraine.

## III. ANALYSIS[23]

### A. Petitioner's case is established by a preponderance of the evidence.

For Petitioner to succeed on her claim that Respondent wrongfully retained S.O.T., Petitioner must establish by a preponderance of the evidence that: (1) S.O.T. was a "habitual resident" of Ukraine immediately before the wrongful retention by Respondent; (2) the wrongful retention was in breach of Petitioner's custody rights under the laws of Ukraine; (3) Petitioner had been exercising or would have been exercising custody rights concerning S.O.T. at the time of the wrongful retention of S.O.T.; and (4) S.O.T. has not attained the age of 16. *See Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004); *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998).

---

[23] To the extent that any of the following conclusions of law represent findings of fact, the undersigned adopts them as such.

Here, it is undisputed that Respondent removed S.O.T. from Ukraine to the United States. Respondent admits that he not only removed S.O.T. in December 2012, but that he also retained S.O.T. past June 3, 2013—the date that Respondent had advised Petitioner that he would return S.O.T. to Petitioner in Ukraine. Of note, Respondent at no time contested that his unilateral decision to retain S.O.T. in the United States past June 3, 2013, was in breach of Petitioner's custody rights under Ukrainian law. Additionally, there is no dispute that S.O.T. is younger than 16 years old.

Thus, the remaining two prongs of this four-part prima facie test remain for the Court to resolve. First, Respondent asserts that this six month period prior to the retention (December 2012 to June 2013), as well as other visits by S.O.T. to the United States during the two years prior to Respondent's removal of S.O.T. from Ukraine, better support the position that either S.O.T. did not have a habitual residence or that the United States, not Ukraine, was S.O.T.'s habitual residence. Second, though it is not completely clear, it appears that Respondent takes the position that Petitioner was not exercising her custody rights at the time of the retention because Petitioner had permitted Respondent to remove S.O.T. from Ukraine and bring her to the United States six months prior to the retention. The undersigned will separately address each of these issues.

### 1. S.O.T.'s Habitual Residence

The interpretation of habitual residence prior to the alleged wrongful retention is vitally important to the Hague Convention because it will dictate the arbiter of the underlying custody dispute. However, neither the Hague Convention nor ICARA actually define the term habitual residence. *Ruiz,* 392 F.3d at 1252. The Eleventh Circuit, in *Ruiz,* set forth the analytical framework for determining habitual residence, however. *Id.* "The first step toward acquiring

a new habitual residence is forming a settled intention to abandon the one left behind." *Id.* (citing *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001)). "[W]hen an alleged abandonment of a clearly established habitual residence for a new home is at issue, the court must determine not only whether the child was settled in his new home, but whether the prior habitual residence was abandoned, and the new home has supplanted the old 'as the locus of the [child's] family and social development.'" *Small v. Clark,* No. 5:06-CV-125-OC-10GRJ, 2006 WL 2024955, at *4 (M.D. Fla. July 17, 2006) (quoting *Mozes,* 239 F.3d at 1084).

Because a young child, such as S.O.T., who was only five years of age at the time of the alleged wrongful retention, does not have a "settled intent" independent of her parents, a court should look to "the settled purpose and shared intent of the child's parents in choosing a particular habitual residence." *Whiting v. Krassner,* 391 F.3d 540, 550 (3d Cir. 2004); *see also Ruiz,* 392 F.3d at 1253. Importantly, the emphasis is on the <u>shared</u> intentions of both parents rather than unilateral intentions of one parent. *Samholt v. Samholt,* No. 1:06-CV-00407, 2006 WL 2128061, at *2 (M.D. N.C. 2006) (citing *Feder v. Evans-Feder,* 63 F.3d 217, 224 (3d Cir. 1995)) (emphasis added). "Where there is no shared or settled parental intent, a prior habitual residence should not be considered to be abandoned unless the objective facts point unequivocally to such a conclusion." *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1344 (S.D. Fla. 2002) (citation and internal quotation omitted). "Because the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement. Moreover, courts have generally refused to find that the changed intentions of one parent shifted the child's habitual residence." *In re Ahumada Cabrera,* 323 F. Supp. 2d 1303, 1311 (S.D. Fla. 2004) (citations omitted).

In addition to the settled intention of the parents, for there to be a relocation of the habitual residence, "there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Ruiz,* 392 F.3d at 1253. However, such indicators of "acclimatization," such as doing well with school and friends, *see id.* at 1253-54, are not a significant factor when the child removed was a young child. *See Yocom v. Yocom,* No. 6:05-CV-590-ORL-28DAB, 2005 WL 1863422, at *5 (M.D. Fla. Aug. 5, 2005) (stating that, in the case of a very young child, "acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence") (citation omitted). The determination of "habitual residency" is a mixed question of fact and law. *Ruiz,* 392 F.3d at 1251-52. In other words, the Court is faced with a fact-intensive inquiry, which culminates in a legal determination of habitual residency.[24]

As an initial matter, it is undisputed that S.O.T. was born in Ukraine and that from her birth date of March 28, 2008, until at least February 2011, S.O.T. lived in Ukraine. Respondent makes much of the fact that S.O.T. and Petitioner made two extended trips to the United States to see Respondent in 2011 and 2012. Respondent argues that these multi-month trips indicate that S.O.T. did not have a habitual residence[25] or that her habitual residence had already changed from Ukraine to the United States prior to her unlawful retention in June 2013. Further,

---

[24]"In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." *Small,* 2006 WL 2024955, at *3 (citing *Childrey v. Bennett,* 997 F.2d 830, 834 (11th Cir. 1993)).

[25] For the Hague Convention to apply, the child must have been "habitually resident in a Contracting State immediately before any breach of custody or access of rights." Hague Convention, Art. 4. The Hague Convention does not provide for a situation, as suggested by Respondent, in which the child is purportedly without a habitual residence. Thus, the undersigned declines to address the argument that S.O.T. did not have a habitual residence and, instead, will address whether S.O.T.'s habitual residence was Ukraine or the United States.

Respondent posits that it was always the intent of Petitioner and Respondent that S.O.T. live in the United States. However, his testimony is belied by his own actions—on June 3, 2013, Respondent took S.O.T. to the airport so she could return to Ukraine, and the only reason he did not follow through was that S.O.T., five years old at the time, was upset that she was leaving the United States.

The facts in evidence do not support Respondent's view that there was ever a shared intent by Petitioner and Respondent to abandon S.O.T.'s habitual residence in Ukraine, as the case law requires, and take up a new habitual residence in the United States. On the contrary, Petitioner ultimately did not object to a temporary visit of no more than six months with Respondent, but she was not given much choice in the matter, as Respondent purchased the non-refundable tickets without Petitioner's permission and did not clear the dates or time periods with Petitioner prior to the purchase. Instead, Petitioner had actually agreed to a shorter visit with Respondent and only because Petitioner needed to seek medical treatment for a back injury. While S.O.T. was in the United States, during what was supposed to be a temporary period, Petitioner enrolled S.O.T. to start preschool upon her return to Ukraine. (Pet. Ex. 9). That act alone makes it very difficult, if not impossible, for the undersigned to conclude that there was a settled intention by Petitioner and Respondent to change S.O.T.'s habitual residence from Ukraine to the United States. At bottom, Petitioner never consented or acquiesced to S.O.T. remaining in the United States past June 2013 and Respondent's unilateral actions cannot shift S.O.T.'s habitual residence. *Accord In re Ahumada Cabrera*, 323 F. Supp. 2d at 1311.

Even if the undersigned were to conclude that there was a shared settled intention to change S.O.T.'s habitual residence from Ukraine to the United States, the Court must also

determine whether there has been "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Ruiz*, 392 F.3d at 1253. Here, it is beyond dispute that there was an actual change in geography prior to the alleged wrongful retention in June 2013 as S.O.T. had been in the United States since early December 2012. Regarding the passage of a significant amount of time for S.O.T. to have become acclimatized, the time period at issue is the same early timeframe of December 2012 to early June 2013. *See* Hague Convention, Art. 3 (timeframe at issue is "immediately before the removal or retention"). Barring significant evidence to the contrary (and there was none), this amount of time is not sufficient for a young child like S.O.T., who was only four years old at the time of her removal from Ukraine and five years old at the time of retention, to become so acclimatized to the United States that her habitual residence as of June 2013 was no longer Ukraine. Consequently, the undersigned concludes that S.O.T. was retained by Respondent in June 2013 outside of her country of habitual residence, Ukraine.

## 2. Petitioner's Exercise of Her Custody Rights

Respondent does not contest that Petitioner had custody rights at the time of retention. Rather, Respondent seems to argue that Petitioner was not exercising her custody rights because she was instead permitting S.O.T. to reside in the United States with Respondent from December 2012 to June 2013. If Petitioner was not exercising her custody rights at the time of retention, then Respondent's retention of S.O.T. was not wrongful. If Petitioner was exercising her custody rights at the time of retention, then Petitioner has met her burden of proving a prima facie case for wrongful retention under the Hague Convention.

"While the Hague Convention does not define the 'exercise' of rights of custody, the Sixth Circuit has stated that '[t]he only acceptable solution, in the absence of a ruling from a

court in the country of habitual residence is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1359 (M.D. Fla. 2002) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). Stated another way, a parent "'cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" *Mendez Lynch*, 220 F. Supp. 2d at 1359 (quoting *Freidrich*, 78 F.3d at 1066). This expansive interpretation of how a parent can exercise custody rights was supported recently by the Fifth Circuit Court of Appeals in *Rodriguez v. Yanez*, 817 F.3d 466 (5th Cir. 2016). According to the Fifth Circuit:

> Under this standard, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights. To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child. Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts.

*Id.* at 472-73 (citation and internal quotation omitted).

With this broad standard in mind, the undersigned turns to the evidence in this case. At no point during the six days of testimony and documentary evidence was any evidence presented that Petitioner ever abandoned S.O.T. On the contrary, the testimony of both Petitioner and Respondent, as well as the documentary evidence, support the conclusion that Petitioner exercised her custody rights at the time of the removal and then continued to do what she could from afar to further exercise those custody rights since S.O.T.'s removal. Petitioner sent numerous letters and packages to S.O.T. Also, Petitioner and S.O.T. have stayed in frequent contact via Skype and phone calls. The packages and calls occurred during S.O.T.'s

six month temporary stay prior to the retention, and Petitioner has not stopped trying to preserve her relationship with S.O.T. Likewise, after Respondent's refusal to return S.O.T. to Petitioner in Ukraine, Petitioner sought S.O.T.'s return and has never stopped pursuing the return of S.O.T.

Accordingly, Petitioner has established by a preponderance of the evidence that Petitioner was exercising custody rights over S.O.T. at the time of Respondent's retention of S.O.T. in June 2013, or would have exercised her custody rights but for the retention. Thus, this prong of the prima facie case under the Hague Convention is also met.

Petitioner has met her burden of proving that Respondent has wrongfully retained S.O.T. within the meaning of the Hague Convention. Consequently, the undersigned must recommend that the Petition be granted and the immediate return of S.O.T. to Ukraine be ordered unless Respondent can meet his burden of proving one of the Hague Convention's narrow exceptions to mandatory repatriation.

**B.** **Respondent cannot meet his burden of proving that any of the Hague Convention's narrow exceptions to the return of child applies.**

The undersigned next turns to whether Respondent has proven, as an affirmative defense, that one of the narrow exceptions to repatriation applies. As an initial matter and as already noted above, Respondent never filed an answer to the Petition, so Respondent may have waived his right to raise any affirmative defenses. Given the issues at stake and the interests of the parties and consistent with the underlying goals of the Hague Convention, however, the undersigned will address the merits of any exceptions that Respondent arguably raised at any point during the proceedings before the undersigned. Because Respondent has not clearly delineated his affirmative defenses, the undersigned has performed the arduous task of sifting through all of the documentary evidence and testimony over the multi-day hearing in an effort

to identify as many purported affirmative defenses as possible. After addressing each below, the undersigned recommends to the Court that Respondent has failed to meet his burden of proof as to any affirmative defense he has arguably made in this case.

1. **Respondent cannot establish by a preponderance of the evidence that Petitioner consented to Respondent's retention of S.O.T.**

Respondent seemingly takes the position that the Court should not order the return of S.O.T. to Ukraine because Petitioner consented to Respondent retaining S.O.T. in the United States, and, alternatively, even if Petitioner did not consent to Respondent's retention of S.O.T., that Petitioner subsequently acquiesced by failing to act upon her rights in a timely manner.

"[A]cquiescence under the Convention requires either: an act of statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070.

At no time has Respondent presented evidence of any formal act, of a convincing renunciation of rights, or of acquiescence by Petitioner. All that Respondent has provided is two documents signed by Petitioner that permit Respondent to travel with S.O.T. (Joint Exs. 1, 5). The earlier dated document states that Respondent has permission to travel with S.O.T. from 2011 to 2020. (Joint Ex. 1). The second document, executed two weeks after the first document, shortens the timeframe so that it instead covers the years 2011 to 2013. (Joint Ex. 5). Notably, however, both Petitioner and Respondent testified that Respondent signed the identical documents for Petitioner so that she could also travel with S.O.T. Thus, even if these documents were sufficiently formal, identical documents permitting each parent to travel independently with S.O.T. can by no means be transmogrified into documents renouncing parental rights or evidencing acquiescence to the wrongful retention of S.O.T. by one parent.

Petitioner's testimony also disproves Respondent's position that Petitioner, by any act or by the mere passage of time, acquiesced to the unlawful retention. Given this record, the undersigned concludes that Respondent failed to establish that Petitioner consented to Respondent retaining S.O.T. in the United States. Thus, the undersigned recommends that the Court conclude that Respondent cannot establish by a preponderance of the evidence that Petitioner consented to Respondent's retention of S.O.T.

> **2.** **Although Petitioner delayed bringing the Petition longer than a year, Respondent cannot prove that S.O.T. has since become settled in the United States.**

The Hague Convention requires the repatriation of a child when there has been a wrongful removal or retention and less than one year has passed between the date of the wrongful removal or retention and "the date of commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is." *See* Hague Convention, Art. 12. Under ICARA, the date of commencement of the proceedings is the date Petitioner filed the judicial petition. *Mendez Lynch*, 220 F. Supp 2d at 1362. Even if more than a year has passed, however, the child "shall" be returned unless the Respondent can demonstrate that "the child is now settled in [her] new environment." *See id.*

The wrongful retention occurred on June 3, 2013, and Petitioner did not file her Petition until October 27, 2016—well over a year after the wrongful retention. The United States Supreme Court has concluded that this one year deadline cannot be equitably tolled. *Lozano v. Montoya Alvarez*, __ U.S. __, 134 S. Ct. 1224, 1235-36 (2014) ("We are unwilling to apply equitable tolling principles that would, in practice, rewrite the treaty."). Nevertheless, the return remedy remains available for Petitioner even after the expiration of one year from the date of the wrongful retention if Respondent cannot meet his burden of proving by a preponderance of

the evidence that S.O.T. is now "settled" in the United States.  For the reasons that follow, the undersigned concludes that Respondent cannot meet his burden and recommends to the Court that this exception fails.

Though the Hague Convention does not define the term "settled," the State Department has instructed that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."  *See* 51 Fed. Reg. 10494-01; *Alcala v. Hernandez*, 826 F.3d 161, 170 (4th Cir. 2016) ("the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment").

Another district court recently surveyed the case law and found that the following non-exhaustive list of factors are typically considered by courts when determining whether a child is settled:

> (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the parent's employment or other means of support; (6) whether the child has friends or relatives in the area; (7) to what extent the child has maintained ties to the country of habitual residence; (8) the level of parental involvement in the child's life; (9) active measures to conceal the child's whereabouts (and the possibility of criminal prosecution related thereto); and (10) the immigration status of the child and parent.

*Castellanos Monzón v. De La Roca*, Case No. 16-0058(FLW)(LHG), 2016 WL 1337261, *12 (D.N.J. April 5, 2016) (collecting cases).  Even more broadly stated, the Court may consider any other factors and circumstances the Court deems to be relevant to the stability and permanence of the child's living arrangement.  *Lops*, 140 F.3d at 946; *De La Riva v. Soto*, No. 2:15-cv-615-FTM-29MRM, 2016 WL 1696539, at *15 (M.D. Fla. Apr. 28, 2016) (finding child was not well-settled because the child's "financial security in the United States is unstable, and

his stay here may come to an abrupt end, since Respondent is here illegally, without a work permit, and could be 'subject to deportation at anytime'").

While a child who has spent a long period of time in the United States is more likely to become settled, that does not appear to be the case with S.O.T., despite the fact that S.O.T. has lived in the United States for over four years. As an initial matter, Respondent's status in the United States is unstable due to the fact that there is an outstanding warrant for his arrest in Ukraine. Consequently, at some point, Respondent may be forced to return to Ukraine to answer to those criminal charges.

Additionally, S.O.T.'s home life in the United States appears unstable, and S.O.T. lacks a solid support system in the United States. Other than Respondent and his wife of less than one year, S.O.T. has only an older half-sister in Michigan, and they are not in frequent contact. Further, S.O.T. did not mention many friends and has inconsistent attendance and frequent tardiness at school, circumstances which are affecting her academic performance. While she does participate in two clubs at school and attends an after school program, her exposure to and involvement in extracurricular activities seems to the undersigned to be relatively minimal for a child her age, especially a child whose parent does not work and is, therefore, available to facilitate her involvement in extracurricular activities.

Importantly, in relation to the stability of S.O.T.'s home in the United States, there is evidence that Respondent is a manipulative and calculated person. For example, there is evidence that Respondent has allegedly manipulated and sexually abused a number of female congregants in his church (one as young as 17 years old). During testimony, Respondent also admitted that he lied to Petitioner on various occasions about the health and well-being of S.O.T. in attempts to get Petitioner to send him money. The evidence additionally demonstrates

that, despite Petitioner's repeated attempts to maintain ties to S.O.T., Respondent systematically alienates S.O.T. from Petitioner and that Respondent instilled and perpetuates in S.O.T. the unsubstantiated belief (or, at the very least, has not tried to shield S.O.T. from his own unsubstantiated belief) that Petitioner is a bad mother and that S.O.T. will be harmed physically upon return to Ukraine. For example, Respondent began to block Petitioner's Skype calls and told S.O.T., among other things, that people get killed in Ukraine, that there is a war in Ukraine, and that Petitioner is ugly and a bad mother.

Overall, it is clear that Respondent continues to foster allegations and reinforces S.O.T.'s negative feelings about her mother. In interviewing the child, it was apparent to the undersigned that S.O.T. is under an enormous amount of pressure to paint a picture of her mother as terrible and her father as wonderful. Mr. Petukhov, a psychologist, opined that Respondent is a manipulative person, and Dr. Carter opined that Respondent's psychological undue influence on S.O.T.'s feelings towards her mother have been harmful to S.O.T. Dr. Carter further opined that such a pattern is emotionally damaging to the child and keeps her embroiled in this ongoing conflict.

S.O.T.'s financial security in the United States is also unstable. Respondent has been unemployed since at least 2009 (albeit purportedly due to a disability for the last few years). Over the years, there have been numerous conversations between Respondent and Petitioner regarding his lack of finances and resulting inability to provide for S.O.T. Moreover, it was noted by Dr. Carter that S.O.T. is underweight by approximately 20 lbs. and has significant dental decay and cavities. While Respondent has convinced himself, as well as S.O.T., that this is because Petitioner is infected with parasites and that S.O.T. is infected when she is in contact with her mother, S.O.T.'s medical records refute this belief.

Respondent has the burden to prove to the Court by a preponderance of the evidence that S.O.T. is well-settled in the United States. After a thorough and careful review of the documentary evidence, testimony, my interview of S.O.T., and the psychological evaluation of S.O.T., the undersigned cannot conclude that Respondent has carried his burden.

Last, even if the Court concludes that S.O.T. is well-settled (or finds for Respondent on any other defense), the Court may still exercise its discretion, under Article 18 of the Hague Convention, to order that S.O.T. be returned to Ukraine. *See* Hague Convention, Art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."). In exercising that discretion, Justice Alito has offered the following as examples of factors that, even if a year has passed and the child has become settled, may outweigh the interest in keeping the child in the new country:

> the child's interest in returning to his or her original country of residence (with which he or she may still have close ties, despite having become settled in the new country); the child's need for contact with the non-abducting parent, who was exercising custody when the abduction occurred; the non-abducting parent's interest in exercising the custody to which he or she is legally entitled; the need to discourage inequitable conduct (such as concealment) by abducting parents; and the need to deter international abductions generally.

*Lozano*, 134 S. Ct. at 1237 (Alito, J., concurring).

Upon careful and thorough consideration of the record before the Court, the undersigned concludes that the goals of the Hague Convention would be furthered by returning S.O.T. to Ukraine. The purpose behind the Hague Convention is "to restore the pre-abduction status quo" while the parents' custody dispute is resolved. Here, pre-abduction, S.O.T. was a habitual resident of Ukraine and was expected to return in June 2013 to Petitioner in Ukraine. Thus, returning S.O.T. to Petitioner in Ukraine now would restore the pre-abduction status quo.

Considering all of the evidence, the undersigned first recommends that the Court conclude that, within the meaning of the Hague Convention, S.O.T. is not well-settled in the United States. Further, even if the Court disagrees with the undersigned and determines that S.O.T. is well-settled, the undersigned recommends that the Court consider whether the goals of the Hague Convention would be furthered by returning S.O.T. to Ukraine and conclude that they would.

> **3.** **Respondent cannot establish by clear and convincing evidence that the return of S.O.T. to Ukraine would expose her to physical or psychological harm or otherwise place her in an intolerable situation.**

Throughout the evidentiary hearing, Respondent wove into his testimony that he fears that the return of S.O.T. to Ukraine will expose her to numerous harms. Specifically, it seems that Respondent believes that the following harms should prevent S.O.T.'s return to Ukraine: the KGB's purported persecution of Respondent for religious and political reasons; the climate and health care system not being suitable for S.O.T.'s allergies; purported abuse at the hands of Petitioner; and the general political climate in Ukraine. For Respondent to succeed on this defense, however, he must show by <u>clear</u> and <u>convincing</u> evidence that the potential harm to S.O.T., if she is returned to Ukraine, is severe. In other words, Respondent "must show that the risk to the child is grave, not merely serious." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11the Cir. 2016) (citation and internal quotations omitted). Here, the undersigned concludes that Respondent has not demonstrated with any credible evidence at all—much less clear and convincing evidence—that these purported harms exist or that any of these harms are grave or even serious.

According to the Eleventh Circuit, "only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the

child in an intolerable situation is material to the court's determination." *Id.* Notably, however, serious threats and violence directed toward a parent can also pose a grave risk of harm to a child. *Id.* at 1010. Importantly, "[t]he exception for grave harm to the child is not license for the court in the abducted-to country to speculate on where the child would be happiest." *Friedrich*, 78 F.3d at 1068. "A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Id.*

As the Second Circuit has stated:

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). With these principles in mind, the undersigned will now address each of the purported harms.

a. Respondent's Entanglement with Ukrainian Law Enforcement

Throughout the evidentiary hearing, both Petitioner and Respondent spent a significant amount of time detailing Respondent's legal issues in Ukraine, and their versions of events were in stark contrast. According to Respondent, he is the subject of a significant and violent persecution by the KGB for his political and religious beliefs. Respondent offered little credible evidence to support his version of his legal entanglements. According to Petitioner, Respondent is the subject of a criminal investigation for allegedly having inappropriate sexual relations with many women in his Ukrainian church. The youngest of Respondent's alleged victims was 17 years old, and, according to Petitioner, a revolt by the victims and their families was the impetus for Respondent fleeing to the United States in October 2009.

Petitioner's testimony was buttressed by the testimony of a psychologist hired by the Ukrainian law enforcement investigative body to assist victims. Even more significantly, Petitioner's version of events was supported by Respondent's own testimony in which he stated that the sexual relations were consensual because of Respondent's power to create "God's children." The undersigned did not find credible Respondent's testimony about political and religious persecution.[26] Further, Respondent offered no credible testimony that any persecution of him for his beliefs would endanger S.O.T. Petitioner, on the other hand, testified that she has been in no danger over the last four years, despite still being married to Respondent for most of that time and living in the same apartment in Kiev, Ukraine. Accordingly, the undersigned does not conclude that Respondent's entanglements with Ukrainian law enforcement, regardless of the cause, create any grave risk of harm to S.O.T.

b. Suitability of Ukraine's Climate and Healthcare System to Address S.O.T.'s Allergies

Throughout the evidentiary hearing, Respondent posited that the cold climate in Ukraine and the Ukrainian health care system would impact S.O.T.'s allergies so negatively that there was a grave risk that she would be medically harmed if the Court ordered her to be returned to Ukraine. All Respondent offered in support of this defense was his own self-serving testimony. Accordingly, Respondent has not met his burden of establishing this grave risk of harm by clear and convincing evidence.

c. Alleged Abuse of S.O.T. by Petitioner

Throughout the evidentiary hearing, Respondent also advanced that Petitioner has been

---

[26] As the finder of fact, the undersigned must weigh the credibility of the witnesses. To do this, the undersigned took into account the candor and demeanor of Respondent when he was on the stand, the inconsistencies in his testimony, and other evidence (including testimony of other witnesses) that refuted his testimony.

verbally and physically abusive toward S.O.T.  Notably, Respondent was unable to testify as to any firsthand knowledge of Petitioner abusing S.O.T.  Rather, Respondent relayed to the undersigned what S.O.T. supposedly told Respondent since she was a very young age.  During the undersigned's interview of S.O.T., she recounted some of these same few alleged events to the undersigned.  S.O.T.'s information, however, seemed coached and not credible. Respondent's testimony also did not seem credible.

It is Dr. Carter's belief that Respondent has engaged in a type of undue influence called "restrictive gatekeeping" based on Respondent's unverifiable belief that Petitioner has serious parenting skill deficits, a serious mental disorder, and that S.O.T. will be kidnapped, persecuted, or killed if she returns to Ukraine.  Dr. Carter opined that S.O.T. presents as a child who has been the victim of pathological alienation and noted that S.O.T. shows behavioral signs of distress (Tic Disorder, Anxiety) and that S.O.T. clearly feels immense pressure to protect her father.

On the other hand, Petitioner and others on behalf of Petitioner testified credibly that no abuse has occurred.  Thus, the undersigned concludes that Respondent also has not met his burden of establishing this grave risk of harm by clear and convincing evidence.

> d.  General Political Climate of Ukraine Being "At War" According to Respondent

Based on Respondent's testimony as well as statements S.O.T. made to the undersigned, it seemed that Respondent took the position that a return to Ukraine and its current political climate alone posed a risk of grave harm to S.O.T.  The grave risk of harm exception indeed is applicable to situations where the Court would be ordering the return of a child to a zone of war, famine or disease.  *See Friedrich*, 78 F.3d at 1069.  However, Respondent, who has not stepped foot in Ukraine for over seven years, has offered only his own self-serving and

unsupported conclusions that Ukraine currently falls within this category. Neither Petitioner nor any of the witnesses testifying for either side from Ukraine painted a similar picture of life in Kiev, Ukraine. Consequently, Respondent has not proven the grave risk of harm exception by clear and convincing evidence.

### 4. S.O.T.'s objection to being returned to Ukraine is not dispositive.

A court may decline to order the return of the child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views." Hague Convention, Art. 13. There is no "mature child" test or a bright line rule governing at what age a child is sufficiently mature and so the application of this defense becomes a very fact-intensive inquiry. Given the age of S.O.T. (eight years old at the time of the evidentiary hearing), for purposes of gathering sufficient information to determine whether it was appropriate to take account of S.O.T.'s objection to being returned to Ukraine, the undersigned both interviewed S.O.T. and also ordered a psychological evaluation of S.O.T.

As with the other defenses, it is the Respondent's burden to prove this defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). Further, the Court has the discretion not to apply this defense if the child's preference is the product of undue influence over the child or has been impacted by the physical separation from the non-abducting parent. *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002)(declining to apply this defense due to abducting parent's undue influence over the child); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 207 (E.D.N.Y.), aff'd, 401 F. App'x 567 (2d Cir. 2010) (discounting child's objection where "the child's view of his mother has clearly been impacted by his physical separation from her for much of his life and the strained and often bitter relationship between his parents").

In her interview with the undersigned, S.O.T. stated that she wants to stay in the United States because she does not like Petitioner, Ukraine is really cold in the winter, and Russian people like to kill Ukrainian people. Dr. Carter found evidence to believe, and the undersigned agrees, that Respondent has unduly influenced S.O.T. to adopt this attitude toward Ukraine and her mother. As a result, the undersigned further agrees with Dr. Carter's ultimate assessment and recommends that S.O.T. is not of sufficient age and maturity for the Court to take account of her views.

## IV.   CONCLUSION

After due consideration and for the foregoing reasons, the undersigned concludes that Petitioner has met her burden of proving, by a preponderance of the evidence, that: (1) S.O.T. was a "habitual resident" of Ukraine immediately before the wrongful retention by Respondent; (2) the wrongful retention was in breach of Petitioner's custody rights under the laws of Ukraine; (3) Petitioner had been actually exercising or would have been exercising custody rights concerning S.O.T. at the time of the wrongful retention of S.O.T.; and (4) S.O.T. has not attained the age of 16. Further, the undersigned concludes that Respondent has not met his burden of establishing that the undersigned should recommend that there is any exception to the repatriation of S.O.T. Thus, because the Hague Convention is intended to restore the pre-abduction status quo, the undersigned concludes that she must recommend that the Court order that S.O.T. should be returned to Ukraine.

Accordingly, it is hereby **RECOMMENDED** that:

(1)  Petitioner's Verified Petition for the Return of Minor Child Pursuant to Hague Convention (Doc. 1) be **GRANTED**;

(2) Respondent be ordered to surrender the minor child, S.O.T., to Petitioner or Petitioner's designee for return to Ukraine without haste;

(3) Respondent be ordered not to interfere with S.O.T.'s return to Ukraine and not to remove S.O.T. from the Middle District of Florida pending Respondent's surrender of S.O.T. to Petitioner or Petitioner's designee for return to Ukraine;

(4) The United States Marshals' Service be directed to ensure that Respondent complies with the Court's Order;

(5) Petitioner's and S.O.T.'s travel documents be returned to them by the Clerk of Court so that they may return to Ukraine;

(6) Respondent's travel documents be returned to him by the Clerk of Court upon confirmation that Petitioner and S.O.T. have departed for Ukraine; and

(7) Petitioner be permitted to seek reimbursement from Respondent for the fees, costs, and expenses reasonably associated with her Petition, including transportation costs.

**IT IS SO REPORTED** in Tampa, Florida, this 26th day of May, 2017.


AMANDA ARNOLD SANSONE
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:

Hon. James D. Whittemore
Counsel of Record